J-S29016-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: F.Q.D.M., A MINOR | : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.M.M., MOTHER | : | No. 88 WDA 2024 |

Appeal from the Decree Entered December 18, 2023
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
84 in Adoption 2023

BEFORE:  DUBOW, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.:                    **FILED: October 16, 2024**

Appellant, S.M.M. ("Mother"), appeals from the decree entered in the Erie County Court of Common Pleas, Orphans' Court, which granted the petition of the Erie County Office of Children and Youth ("OCY") for involuntary termination of Mother's parental rights to her minor child, F.Q.D.M. ("Child") (born in April 2008).  We affirm and grant counsel's petition to withdraw.

The relevant facts and procedural history of this case are as follows. OCY received a referral on January 2, 2023 that Child was life-flighted to Children's Hospital of Pittsburgh and placed in an induced coma after he sustained a traumatic head injury of unknown origin.  The injuries occurred while Child was in Mother's care and Mother was unable to explain the injury or the circumstances surrounding the injury.  Mother was arrested and charged with aggravated assault, endangering the welfare of a child, and possessing instruments of crime in connection with this incident.  On January

4, 2023, the court granted OCY's application for emergency protective custody. On January 9, 2023, OCF filed a dependency petition claiming that Child was without proper parental care and control based on, *inter alia*, the serious injury Child sustained while in Mother's custody, Mother's history of mental health and substance abuse issues, and unstable and unacceptable housing conditions. The court adjudicated Child dependent on January 25, 2023.

Mother agreed to the following treatment plan:

1. Cooperate with [OCY]'s involvement to include, signing any and all releases, attend all scheduled home visits, team meetings, and return phone calls or other means of communication in a timely and appropriate manner;

2. Obtain/maintain safe, stable housing, including maintaining the household so that it is free of hazards, obtaining appropriate bedding for [Child], and ensuring there is no mold or other sources of airborne toxins throughout the home;

3. Complete an updated mental health assessment and follow all recommendations and demonstrate mental health stability;

4. Participate in and successfully complete [an OCY] approved parenting program and will demonstrate the ability to safely parent [Child] without the use of inappropriate discipline;

5. Successfully complete an anger management program to refrain from further acts of violence by developing the ability to identify triggers and properly cope with them as they emerge in real time;

6. Successfully complete a domestic abuse violence avoidance program to refrain from further acts of violence by developing the ability to identify triggers and properly cope with them as they emerge in real time. Further, refrain from

further acts of violence, including using physical discipline with [Child];

7. Submit to urinalysis at the request of [OCY] and submit to a drug and alcohol assessment through the Erie County Office of Drug and Alcohol, and;

8. Comply with the criminal component of the investigation in this matter, and further comply with any consequences and services deemed necessary by the appropriate court of law.

(Order of Adjudication and Disposition, filed 1/26/23, at 3).

The court conducted a permanency review hearing on April 5, 2023. OCY informed the court that Mother was released from prison on bail on February 17, 2023. After being released, Mother contacted her caseworker to review her treatment plan and appeared willing to engage in services. Child informed OCY caseworkers and the court that he did not wish to have any contact with Mother. At the conclusion of the hearing, the court concluded that Mother had been minimally compliant with the treatment plan and had made minimal progress towards alleviating the circumstances that necessitated Child's placement. Additionally, based on Mother's pending criminal charges in connection with Child's injuries and Child's wishes to have no contact with Mother, the court determined that any visitation with Mother posed a grave threat to Child and did not order visitation.

On September 14, 2023, OCY filed a motion to change Child's permanency goal to adoption. The court conducted a second permanency review hearing on October 6, 2023. Child was present at the hearing and informed the court that he wished to be adopted and did not want to reunify

with Mother. OCY further informed the court that there were increased concerns about Mother's mental health due to statements she made which demonstrated a distorted perception of reality. At the conclusion of the hearing, the court determined that Mother was minimally compliant with her treatment plan and made no progress in alleviating the circumstances that led to Child's removal. Additionally, based on Mother's failure to acknowledge any responsibility in the circumstances that led to Child's injuries, Mother's lack of progress, and Child's express wishes, the court changed the permanency goal to adoption.

OCY filed a petition for involuntary termination of Mother's parental rights to Child on October 13, 2023. On December 15, 2023, the court held a termination hearing. The court accurately summarized the testimony presented as follows:

> [Danielle] Urban[, an OCY caseworker,] testified that she became involved in this case after [Child] suffered a substantial injury to his head, alleged to have been caused by Mother, which resulted in him being life-flighted to [Children's Hospital of Pittsburgh] and placed in a medically induced coma. At the time of the [termination hearing], Ms. Urban testified, Mother was still awaiting trial on her criminal charges stemming from this incident.
>
> Ms. Urban further testified [that] at the time the petition was filed, [OCY] also had concerns with Mother's unaddressed mental health, past substance abuse and home conditions. According to Ms. Urban, in January 2023, Mother's home was extremely cluttered with various items and garbage, there were no accessible beds for [Child], and she was facing eviction. Notably, this was the family's thirty sixth (36th) referral to [OCY].

Ms. Urban had little involvement with Mother early on in the case because Mother was incarcerated. Ms. Urban testified, to Mother's credit, when she made bond on February 17[, 2023], she reached out to [OCY] to go over her treatment plan. Ms. Urban testified that Mother met with her monthly during the first review period[. H]owever, [Mother] refused to sign releases for [OCY] to access her mental health records and would not tell Ms. Urban where she was residing. Ultimately, Ms. Urban testified, Mother had minimal compliance with her treatment plan during the first review period, partially due to the limited time [OCY] had to make referrals for her due to her incarceration.

Regarding [Child], Ms. Urban testified [that] he did not want to have any visits with … Mother and "made it clear that he did not want to return home." [(N.T. Termination Hearing, 12/15/23, at 10).]

[William] Rounsley testified that he became involved in the case in July of 2023. Regarding [Child], Mr. Rounsley testified [that from the first time he met Child, Child has expressed reservations about reunification with Mother. On or around September 11, 2023, Child told Mr. Rounsley that he wants to be adopted. Child also does not refer to Mother as "mother" or "mom" but calls her by her first name.]

* * *

Mr. Rounsley testified [that Child] continued to struggle with his placements, which hinders his ability to consistently participate in therapy for his trauma.

Mr. Rounsley described his initial encounters with Mother as essentially uneventful. He stated [that] she was a bit guarded at first, but willing to meet with him and address the issues set forth in her treatment plan. Mother was receiving medication management, counseling services through the Crime Victim Center and residing with a roommate in an apartment [that] she allowed Mr. Rounsley to access.

According to Mr. Rounsley, a few weeks before the October review hearing, Mother's mental health began declining. Mr. Rounsley recounted [an incident on] September 13[, 2023]

… where Mother became convinced that she had been arrested in York, Pennsylvania for an "incident that she didn't remember." (*Id.* at 21). Mr. Rounsley described Mother as very erratic during this encounter and stated [that] "she was having a hard time focusing and her mind was racing." (*Id.*) Ultimately, Mr. Rounsley and the other supports present determined it would be in Mother's best interest to contact Crisis Services. Mr. Rounsely testified [that] he also reached out to York County and clarified that Mother was not the same individual facing charges there[. H]owever, Mother was "certain that it was her … and she asked [OCY] for assistance with gas money for getting to York." (*Id.* at 22).

Mr. Rounsley testified that two days later, on September 15[, 2023], he had a conversation with Mother at her residence that again caused him great concern for her mental health. [When Mr. Rounsley visited Mother at her residence, she stated that Shaquille O'Neal gave her a substantial amount of money and the Erie Police Department took the money from her apartment. Mother further stated that Mr. Rounsley worked for the Federal Bureau of Investigation ("FBI").]

\* \* \*

After this meeting, Mr. Rounsley addressed his concerns by taking the matter before a multi-disciplinary team who recommended to contact Crisis Services again and Mother's treating psychiatrist. According to Mr. Rounsley, Crisis Services made contact with Mother, who declined any mental health services.

…Mother [testified] to the steps she believes she has taken to achieve reunification with [Child]… According to Mother, her housing was problematic … at the time of removal because she was in the process of moving from the residence as the landlord was selling the property. [Mother admitted that] at the time of the [termination hearing], eleven (11) months later, Mother still did not have secure housing. Mother testified that she has been meeting monthly with her psychiatrist at LECOM [Behavioral Health] for medication management and participating in a family recovery program through the Erie Family Center.

Mother testified that her relationship with a paramour ended in September 2023 due to domestic violence. As a result, Mother engaged in services with SafeNet and trauma therapy through the Crime Victim Center. When asked about [her] drug and alcohol assessment, Mother testified that she only drinks wine coolers occasionally. When asked why she requested a prescription … to assist with her drinking, Mother responded "…I felt like things were being placed in my alcoholic beverages, maybe I was being drugged through my alcohol…" [(*Id.* at 49).] Mother testified that she believed this was occurring when she was "hanging around … people [she] thought [she] could trust." [(*Id.*).]

Regarding [Child], Mother testified that she does not believe that he does not wish to reunify with her. [When asked,] Mother … chose "not to discuss" the alleged money she received from Shaquille O'Neal.

(Orphans' Court Opinion, filed 3/24/24, at 8-11) (some citations omitted).

Christine Konzel served as both the guardian *ad litem* ("GAL") and Child's legal counsel. Attorney Konzel informed the court that Child, who was 15 years old at the time of the hearing, has consistently maintained that he does not wish to see Mother or live with her again. Based on her conversations with Child and her review of the circumstances of this case, Attorney Konzel opined that Child's legal interests and best interests merge and supported termination of Mother's parental rights.[1]

On December 15, 2023, the court terminated Mother's parental rights

---

[1] The court determined that there was no conflict of interest that prevented Attorney Konzel from serving as Child's guardian *ad litem* and legal counsel.

to Child pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5) and (b).[2]  Mother filed a timely notice of appeal on January 16, 2024.[3]  Mother's counsel further filed a statement of intent to file an ***Anders***[4] brief on the same day.  On June 21, 2024, Mother's counsel filed an ***Anders*** brief and application to withdraw in this Court.

As a preliminary matter, counsel seeks to withdraw her representation pursuant to ***Anders*** and ***Commonwealth v. Santiago***, 602 Pa. 159, 978 A.2d 349 (2009).  ***Anders*** and ***Santiago*** require counsel to: (1) petition the Court for leave to withdraw, certifying that after a thorough review of the record, counsel has concluded the issues to be raised are wholly frivolous; (2) file a brief referring to anything in the record that might arguably support the appeal; and (3) furnish a copy of the brief to the appellant and advise her of her right to obtain new counsel or file a *pro se* brief to raise any additional points the appellant deems worthy of review.  ***Santiago, supra*** at 173-79, 978 A.2d at 358-61.  Substantial compliance with these requirements is sufficient.  ***Commonwealth v. Wrecks***, 934 A.2d 1287, 1290 (Pa.Super. 2007).  After establishing that counsel has met the antecedent requirements

---

[2] The Orphans' Court also terminated Child's father's parental rights on the same day.  Child's father did not participate in the termination hearing and is not party to this appeal.

[3] Mother filed the notice of appeal on the Tuesday following the Martin Luther King Jr. Day holiday.

[4] ***Anders v. California***, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

to withdraw, this Court makes an independent review of the record to confirm that the appeal is wholly frivolous. ***Commonwealth v. Palm***, 903 A.2d 1244, 1246 (Pa.Super. 2006). ***See also Commonwealth v. Dempster***, 187 A.3d 266 (Pa.Super. 2018) (*en banc*).

In ***Santiago, supra***, our Supreme Court addressed the briefing requirements where court-appointed appellate counsel seeks to withdraw representation:

> Neither ***Anders*** nor [***Commonwealth v. McClendon***, 495 Pa. 467, 434 A.2d 1185 (1981)] requires that counsel's brief provide an argument of any sort, let alone the type of argument that counsel develops in a merits brief. To repeat, what the brief must provide under ***Anders*** are references to anything in the record that might arguably support the appeal.
>
> \* \* \*
>
> Under ***Anders***, the right to counsel is vindicated by counsel's examination and assessment of the record and counsel's references to anything in the record that arguably supports the appeal.

***Santiago, supra*** at 176, 177, 978 A.2d at 359, 360. Thus, the Court held:

> [I]n the ***Anders*** brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Id.*** at 178-79, 978 A.2d at 361. ***See also In re J.D.H.***, 171 A.3d 903, 905-

- 9 -

06 (Pa.Super. 2017) and *In re V.E.*, 611 A.2d 1267, 1275 (Pa.Super. 1992) (explaining that *Anders* procedure applies in appeals from termination of parental rights and goal change orders).

Instantly, Mother's counsel filed a petition to withdraw and an *Anders* brief. Counsel claims to have conducted a conscientious review of the record and determined the appeal is wholly frivolous. Counsel supplied Mother with a copy of the brief and a letter explaining Mother's rights to retain new counsel or to proceed *pro se*. In the brief, counsel provides a summary of the facts and procedural history of the case. Counsel's argument refers to relevant law that might arguably support Mother's issues. Counsel further states the reasons for his conclusion that the appeal is wholly frivolous. Thus, counsel has substantially complied with the requirements of *Anders* and *Santiago*. *See Wrecks, supra*.

Counsel raises the following issues on Mother's behalf:

A. Whether the Orphans' Court committed an error of law and/or abused its discretion when it concluded that termination of parental rights was supported by clear and convincing evidence pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), [and] (5)?

B. Whether the Orphans' Court committed an error of law and/or abused its discretion when it concluded that termination of parental rights was supported by clear and convincing evidence pursuant to 23 Pa.C.S.A. § 2511(b)?

(*Anders* Brief at 6).

In her issues combined, Mother argues that she was partially compliant with the treatment plan and made progress towards alleviating the

- 10 -

circumstances that necessitated Child's placement. Mother asserts that she reached out to OCY as soon as she was released from prison and maintained regular meetings with caseworkers in an attempt to comply with the treatment plan. Mother claims that she further engaged in medication management and counseling services to address her mental health. Mother contends that a bond exists between her and Child, and she does not believe that Child does not want to reunite with her. Mother concludes that the trial court erred in terminating her parental rights, and this Court must grant relief. We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be

resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

OCY filed petitions for the involuntary termination of Mother's parental rights to Child on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to

- 12 -

be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b)  Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (b).  "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." **In re Z.P., supra** at 1117.  When conducting a termination analysis:

Initially, the focus is on the conduct of the parent.  The party

- 13 -

> seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of…[her] parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Z.P., supra* at 1118.

Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of [her] parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The

court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

Further, our Supreme Court has recently clarified that, in making a Section 2511(b) determination, a trial court must analyze: (1) whether the parental bond is "necessary and beneficial to the child;" (2) "the child's need for permanency and length of time in foster care;" (3) "whether the child is in a pre-adoptive home and bonded with foster parents;" and (4) "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety and stability." *Interest of K.T.*, ___ Pa. ___, ___, 296 A.3d 1085, 1113 (2023). Moreover, the Court explained that, when reviewing the nature of the parental bond, a court must consider "whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* Importantly, the *K.T.* Court's decision is particularly relevant to an analysis of an existing parental bond. "In cases where there is no evidence of any bond between the

parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

Instantly, Child has not been in Mother's care since January 2, 2023, when Child sustained an unexplained traumatic head injury that resulted in Child being placed in a medically induced coma. The court determined that the conditions that necessitated Child's removal continued to exist, explaining:

> Mother was indicated as a perpetrator of abuse to [Child], and throughout the life of this case, has not taken any actions to acknowledge the trauma [Child] has suffered. Thus, Mother's failure to acknowledge the physical abuse makes it impossible for her to alleviate the conditions that led to the dependency action, as one cannot alleviate what they don't acknowledge.
>
> Additionally, … in the nine (9) months preceding the October review hearing, where the goal was changed to adoption, Mother had minimal compliance with her treatment plan and her mental health substantially declined.
>
> At the time of the [termination hearing], Mother still did not have [stable] housing, had obtained a [protection from abuse ("PFA") order] against her paramour, and her mental health remained observably unstable. Despite [OCY]'s support and the services Mother had in place, *i.e.*, medication management, trauma therapy, [and] support from a domestic violence agency, she had still been unable to resolve any of the issues that led to the dependency action. Eleven (11) months after the adjudication, Mother was still unable to demonstrate an ability to provide [Child] with safe and stable housing or care for his physical and emotional needs.

(Orphans' Court Opinion at 15). The record supports the court's analysis. *See*

*In re Z.P., supra*. As such, we discern no abuse of discretion in the court's determination that termination of Mother's parental rights was warranted under Section 2511(a)(5). *See* 23 Pa.C.S.A. § 2511(a)(5); *In re B., N.M., supra*. Thus, we need not address the remaining Section 2511(a) subsections. *See In re Z.P., supra*.

Relevant to Section 2511(b), Child has not visited with Mother since he was removed from her care. Child has not expressed any desire to see or reunify with Mother throughout the pendency of this case and only refers to Mother by her first name. Additionally, Child clearly expressed his desire to be adopted to Attorney Konzel and the court. From its observations of Child, the court opined that Child is "mature and intelligent enough to advocate for his wishes regarding reunification." (Orphans' Court Opinion at 15). Attorney Konzel stated that Child's wishes align with his best interests, as concerns about Mother's mental health and Child's physical and emotional wellbeing in Mother's care continued to persist at the time of the termination hearing. Further, nothing in the record indicates that Mother and Child have a bond at this point. *See In re K.Z.S., supra*. As such, the record demonstrates that termination will best serve the needs and welfare of Child. *See* 23 Pa.C.S.A. § 2511(b); *Z.P., supra*. Following our independent review of the record, we agree with counsel that the appeal is frivolous. *See Dempster, supra*; *Palm, supra*. Accordingly, we affirm and grant counsel's petition to withdraw.

Decree affirmed; counsel's petition to withdraw is granted.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: <u>10/16/2024</u>